168 P.3d 1110 (2007)
2007-NMCA-117
STATE of New Mexico, Plaintiff-Appellee,
v.
Juan SILVA, Defendant-Appellant.
No. 24,273.
Court of Appeals of New Mexico.
June 26, 2007.
Certiorari Granted, August 15, 2007.
*1112 Gary K. King, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellee.
Kennedy & Han, P.C., Paul J. Kennedy, Albuquerque, NM, Caren I. Friedman, Santa Fe, NM, for Appellant.

OPINION
KENNEDY, Judge.
{1} Defendant Juan Silva appeals his convictions for second-degree murder, conspiracy to commit second-degree murder, and tampering with evidence. We reverse his conviction for tampering with evidence as unsupported by substantial evidence. We affirm the district court's ruling that the hearsay statement of a co-defendant was admissible as a statement against penal interest. Last, we hold that the district court's refusal to allow cross-examination of a State witness, Bobby Salas (Salas), concerning perjury and the State's agreement not to prosecute him when his trial testimony varied *1113 from testimony he gave at a deposition, was not harmless error. We remand for a new trial.
FACTS AND BACKGROUND
{2} During the late night of August 30, 2001, and the early morning hours of August 31, Mario Hernandez (Decedent) was killed by a single gunshot to the back of his head at an apartment occupied by Salas. Starting with his first contact with police, Salas gave numerous conflicting statements, some occurring under oath at a deposition. From statement to statement, Salas admittedly lied about the circumstances of the shooting, his actions at the time of the incident, whether or not he actually heard a gunshot, the circumstances of his return to his apartment, how he came to identify participants in the incident, his conversations to police, and his deposition testimony. It is not an exaggeration to state that Salas was a remarkably inconsistent historian. He was, however, the closest thing to an eyewitness to the murder for the State.
{3} When Salas's statements are boiled down, the evidence suggests that Salas opened his front door to a young man asking for Decedent. That young man and anywhere from six to eight companions then forced their way into the apartment. A scuffle may or may not have ensued with Decedent. Salas heard Decedent say, "[n]o, Nanos, no" before Defendant began punching him. Defendant is known as "Nanos." Salas took off running about this time, and testified that he may have heard a shot before he fled the apartment to a nearby motel for help. Salas told police that he did not know who did the shooting and could not pick Defendant or his co-defendants out of a photo array, although he later identified Defendant and one of his co-defendants at trial.
{4} The day after the shooting, Salas called the police to tell them that some unknown person had slipped pictures of Defendant and two co-defendants under his door, which was a lie. He identified the persons in the pictures as persons who had participated in the shooting. At his deposition, Salas said he did not know the source of the photographs. However, he admitted at trial that this was a lie, and named two young women as the source, including another of the State's witnesses, Veronica Castro (Castro). Defendant's counsel alerted the court to Salas's apparent perjury. In a hearing outside the presence of the jury, with Salas present on the witness stand, the prosecutor stated that he had no intention of prosecuting Salas for perjury. The district court ruled that Defendant could not cross-examine Salas on either the perjury or the statement by the prosecutor that the State did not intend to pursue perjury charges.
{5} Fifteen-year-old Castro testified that co-defendant Joseph Silva (Joseph) had come to her the night of the shooting and told her that he had shot Decedent. There is some dispute as to the source and timing of a second related statement, which Castro's testimony indicates came in a later telephone call from Joseph to Castro, that Defendant had told him to shoot Decedent. These statements were admitted by the district court as evidence over Defendant's objection, citing the exception to the hearsay rule allowing admission of statements against interest. Other facts will be included during the discussion as necessary.
DISCUSSION
{6} There are three issues discussed in this appeal: (1) whether the district court erred in admitting hearsay statements in which co-defendant Joseph also implicated Defendant through Castro, (2) whether the district court erred in refusing to allow Defendant to cross-examine Salas about the State's promise not to prosecute him for perjury, and (3) whether there was sufficient evidence to support Defendant's conviction for tampering with evidence.
The District Court's Ruling Limiting Salas's Testimony and Cross-Examination
{7} As a witness to a murder, Salas was a singularly bad historian. Salas had given at least two statements to police about the murder in his house and its perpetrators, which had significant inconsistencies. Salas was the only witness who testified about who came into his house and fought with Decedent. He failed to identify any of the defendants from photo arrays immediately *1114 following the incident, even though their photographs were included in the arrays and he later identified them in a police interview and at trial. He identified the defendants only after Castro and her friend came to his house and showed him pictures of the persons they believed were involved  pictures including Defendant. Salas lied under oath at his deposition about the manner in which he had seen those pictures.
{8} In his deposition, which was taken before the district court with the judge present, he admitted having lied to the police concerning the time of the incident, where he was, with whom, and his actions during and after the murder. Salas testified variously that he had never heard Defendant's nickname "Nanos" prior to Decedent saying "[n]o, Nanos, no" during the incident, but then testified that two or three days before the shooting he had overheard a telephone conversation in which Decedent told someone named "Nanos" that he would "kick his ass" and "he was going to blow his head off." On the stand at trial as a witness for the State, Salas admitted that he had lied in his deposition.
{9} Just prior to cross-examination, defendant Michael Gonzales's attorney, who was the lead defense attorney for purposes of Salas's cross-examination brought to the court's attention that Salas was about to admit that he had lied in a sworn deposition. In a discussion concerning whether Salas should be Mirandized or given counsel, the prosecutor stated, "I don't plan on going after him on any perjury charges, and I can let him know right now that we are not going to do that." Later, when confronted with an argument that immunity for perjury is beyond the capability of the State, the prosecutor said:
I think the State can offer use immunity on anything they want to, as long as it meets the [c]ourt's approval. We have a murder case. That's small potatoes in my mind to what we need to do to find the truth. I will state on the record that he will not be prosecuted and we will offer use immunity.
The district court took a recess and returned. At that time, the State maintained that perjury was not involved, and that once a witness had been immunized, they could be charged with perjury if they testified falsely while immunized. The State's theory was that the perjury dealt with Salas's lying about the source of the photographs, which was not material to the charges before the court. After further discussion, the State reiterated its position that Salas had not perjured himself on anything material: "That wasn't even before a jury at the time. Now we are before a jury. Now he needs to be truthful. I mean, that's why we don't see perjury charges by the D.A.'s office, because of that statute." Defendant's attorney responded,
That flies in the face of the oath. It was a formal deposition before the [c]ourt. Of what use is there for giving oaths to witnesses at depositions if they can lie and well, now we can make it up or something. I'm not sure I follow the State's analysis.
{10} The court declined to grant immunity to Salas, but advised him that: "[I]f in the last proceeding you intentionally made any false misstatements or knowingly made any misstatements that you knew were false, that you have a right to bring that to my attention and we will address it without you answering any questions regarding that." The Court went further:
And I would preclude the State from inquiring as to whether he intentionally or knowingly made any misstatements. I'm not talking about inconsistencies, but I think that the key here is knowing misstatements, and if we get into that area, I think that Mr. Salas does have a right  and we will discuss it at that point. . . . I preclude the State from going into questions about whether he knowingly made statements falsely under oath[.]
The district court forbade the defense from making a record before the jury, and warned Salas: "Let me make a record that Mr. Salas, you are under oath. Anything you falsely say in court today, if you knew it to be false when you say it, is subject to prosecution for perjury so you understand that, that you have to tell the truth today." Salas acknowledged that he understood. Salas *1115 then testified that he had not been promised anything for his testimony.
{11} The cross-examination subsequently began with a bench conference in which the defense asked the district court for guidance concerning their use of the State's representation that they did not intend to prosecute Salas for perjury. The district court ruled that it would not impede vigorous cross-examination about untrue statements under oath, but then stated:
I think that the key here is whetherif the State promised him something to come in, I think that's a little different. I see a difference. I wouldn't allow going into that particular area that the State offered him immunity to testify, and it wouldn't be true. They may have offered it, but the [c]ourt didn't grant it, so I think that area is still out of bounds. Any inconsistent statements are in bounds.
{12} After the State declared, in front of Salas, that it would not prosecute him for perjury, Salas twice testified in response to the State's questions that he had received no promises or benefits for his testimony. It is the subject of these exchanges concerning Salas's false testimony and the State's promise of immunity that Defendant now asserts he should have been allowed to raise on cross-examination.
{13} The State argues that the limitation was not unduly burdensome for the following reasons: (1) Salas did not commit perjury, and (2) the State did not offer Salas formal immunity from prosecution for perjury. Defendant argues that the limitation of cross-examination, especially for a key prosecution witness like Salas, violated his constitutional rights because the jury was not able to draw its own conclusions based on the reliability of Salas's testimony. Defendant further argues that the district court's ruling was not harmless error, particularly when considered in conjunction with the limitation of cross-examination on Salas's past convictions for second degree murder.
{14} "The Sixth Amendment to the United States Constitution provides that, in criminal prosecutions, the accused shall have the right to confront the witnesses against him." State v. Casaus, 1996-NMCA-031, ¶ 22, 121 N.M. 481, 913 P.2d 669. The Confrontation Clause is applied to the states through the Fourteenth Amendment. State v. Martinez, 1996-NMCA-109, ¶ 9, 122 N.M. 476, 927 P.2d 31.
{15} We first address the State's argument that Defendant's Sixth Amendment Confrontation Clause claim was not preserved. The State posits that Defendant was not specific enough in his objections to the district court to preserve the issue for appellate review. In order to preserve a question for review, "it must appear that a ruling or decision by the district court was fairly invoked." Rule 12-216(A) NMRA. When arguments are "adequate to alert the trial court to the basis for [d]efendant's proffer," we consider the argument preserved. Martinez, 1996-NMCA-109, ¶ 11 (internal quotation marks and citation omitted). Defendant's offer to the judge in the district court was that the "lies" told by Salas were material to the case, and that those "lies" went "directly to [Salas's] credibility." The discussion regarding Salas's testimony about his perjury went on for some time before the district court judge. We hold that the district court was sufficiently alerted to the potential error and that counsel obtained an intelligent and informed ruling, thereby preserving the Confrontation Clause issue for appeal. Id. ¶ 12.
{16} We now turn to the substantive issues. First, we hold that the issues surrounding Salas's identification of Defendant were material. "A statement is material if it has a natural tendency to influence or the capability to influence the decision of the decision-making body to which it is addressed." State v. Benavidez, 1999-NMCA-053, ¶ 26, 127 N.M. 189, 979 P.2d 234. Despite being shown photo arrays including defendants immediately after the crime on at least two occasions, Salas, who had told police that he was "face-to-face" with the persons who barged into his house, was unable to identify any of the defendants, and in fact incorrectly identified a person who was not involved in the crime. It was only after the young women took photographs to his house, discussed with him and showed him pictures of the defendants, that he called the police *1116 with his concocted story and thereafter identified the defendants. There were inconsistencies in his descriptions of Defendant throughout his statements. Salas's ability to identify Defendant is most material to his guilt, and any outside coaching or assistance Salas received in coming to his eventual identification bears on a material fact in the case and would itself be material to his credibility and an element of the offense that is essential to the outcome of the proceeding. Hence, any lies he told about how he came to his identification of Defendant are material to the issues on trial.
{17} Second, we hold that no immunity under the applicable rule of court was conferred, since a district attorney alone is powerless to grant immunity from prosecution to any witness, see Rule 5-116 NMRA; State ex rel. Plant v. Sceresse, 84 N.M. 312, 313, 502 P.2d 1002, 1003 (1972) ("District Attorneys in New Mexico, it is true, have no power to grant immunity from prosecution to any witness."), and such a grant requires fulfilling specific procedural requirements and obtaining judicial consent. See Campos v. State, 91 N.M. 745, 747, 580 P.2d 966, 968 (1978) (reversing conviction for contempt against witness for refusing to testify under grant of immunity when procedural requirements for immunity have not been met).
{18} This is not to say, however, that the State did not represent in open court that it would not pursue Salas for any perjury, nor that such a representation would not be binding on the State should Salas have later been charged with perjury as a result of his testimony. Sceresse, 84 N.M. at 314, 502 P.2d at 1004 (holding that the prosecutor's agreement not to prosecute in exchange for testimony was enforceable by defendant); State v. Plant, 86 N.M. 2, 4, 518 P.2d 961, 963 (Ct.App.1973) (holding that statements by prosecutor to court that a witness's statements would not be used against him in any prosecution had effect of binding admission by State). But for the representations of the prosecutor at trial, Salas had a "reasonable expectation of future and continuing dealing with the State as an adverse party." State v. Gonzales, 1999-NMSC-033, ¶ 25, 128 N.M. 44, 989 P.2d 419.
{19} It is impossible to tell what testimony the State was intending to give the witness immunity on: his deposition testimony or the testimony proffered on the stand; either excludes the other. In essence, it would be fair to view immunity as essentially giving Salas a free ride for any false statements under oath that were given at trial, since it is his trial testimony that was sought to be protected by the State. See State v. Summerall, 105 N.M. 82, 83, 728 P.2d 833, 834 (1986) (holding that it is contrary to New Mexico law for a witness to be immunized against any liability for perjury arising from his testimony at trial). Implicit in any grant of immunity is the condition that the witness testify truthfully or be subject to prosecution for perjury or contempt. State v. Boeglin, 100 N.M. 470, 471, 672 P.2d 643, 644 (1983). In the case before us, we can presume that the State was offering Salas's testimony at trial as his "true" testimony, knowing full well that it directly contradicted his previous sworn deposition in many respects.
{20} A full and vigorous cross-examination of Salas at trial, including inquiring as to both the material discrepancies with his deposition testimony and his motivations for changing his stories at trial, would be required to comport with due process and Defendant's rights under the Sixth Amendment. Fairness demands a full exposition of the inducements for testimony provided to the witness. "[T]he jury should be instructed . . . that they should consider the inducements and influences of hope, or promises, under which such testimony is given." Territory v. Chavez, 8 N.M. 528, 538, 45 P. 1107, 1110 (1896). Bias and a motive to fabricate, even when evidence of a deal is absent, should be presented to a jury for its consideration in judging a witness's credibility. Martinez, 1996-NMCA-109, ¶ 17. A jury should also be able to take into consideration whether a witness "hoped to curry favor by cooperating with the prosecution." Id.
{21} There are two levels of scrutiny in which we engage concerning the scope of cross-examination at play in this case. Ordinarily, we review a trial court's ruling on the scope of cross-examination for an abuse of discretion. State v. Sanders, 117 N.M. *1117 452, 460, 872 P.2d 870, 878 (1994) ("[T]he trial court [has] discretion to limit cross-examination in the interest of insuring [sic] a fair and efficient trial."). We only find an abuse of discretion when "the ruling is clearly against the logic and effect of the facts and circumstances of the case." State v. Apodaca, 118 N.M. 762, 770, 887 P.2d 756, 764 (1994) (internal quotation marks and citation omitted). However, when a cross-examination is unduly limited by the district court, a constitutional error results. Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). We review de novo whether the limitation was a violation of the Confrontation Clause. United States v. Ellzey, 936 F.2d 492, 495 (10th Cir.1991); Martinez, 1996-NMCA-109, ¶ 14. We examine the district court's ruling to determine whether the limitation the district court placed on the cross-examination violated defendant's rights, and if error, whether it was sufficiently harmful and prejudicial so as to merit reversal. Martinez, 1996-NMCA-109, ¶ 19 ("[C]onstitutional errors are subject to a harmless error analysis.").
{22} Early on in his cross-examination, Salas testified that he had not been offered anything in exchange for his trial testimony. This statement passed without objection or a request for a bench conference by the defense team. Although he specifically admitted giving false sworn testimony at his deposition on more than one occasion during cross-examination by the various defense attorneys, he was not cross-examined concerning whether he had been promised a free ride from perjury charges, nor was the matter pressed. At the end of re-direct, he stated that he had received no benefit in exchange for testifying. Again, no defendant objected. Salas stated on a number of occasions that he was telling the truth on the stand, irrespective of his previous statements.
{23} The Supreme Court has applied the harmless error rule in cases dealing with violations of the Confrontation Clause. Davis, 415 U.S. at 318, 94 S.Ct. 1105; Carrillo v. Perkins, 723 F.2d 1165, 1170 (5th Cir. 1984) ("[W]e have repeatedly applied the harmless-error rule in decisions finding violations of the right of effective cross-examination."). If a violation of the Confrontation Clause occurred, it does not necessarily result in a new trial if the error was harmless beyond a reasonable doubt. Perkins, 723 F.2d at 1171. "Federal constitutional error cannot be deemed harmless if there is a reasonable possibility that the evidence complained of might have contributed to the conviction." State v. Alvarez-Lopez, 2004-NMSC-030, ¶ 25, 136 N.M. 309, 98 P.3d 699 (internal quotation marks and citations omitted). In order to determine whether a constitutional error was harmless beyond a reasonable doubt, we consider: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).
{24} In this case, Salas's testimony was important, if not crucial, to the State's case. Salas's credibility was an important issue in the case, and the jury was entitled to hear about any evidence relevant to his credibility, including an agreement, or "understanding" that he would not be prosecuted for perjury. See Giglio v. United States, 405 U.S. 150, 155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility and the jury was entitled to know of it."). The district court ruled that there was to be a complete bar into any inquiry of an agreement or understanding between Salas and the State. The fact that the district court based its view on the notion that the offer of immunity had not been made until Salas was already on the stand, and that the district court had not ordered that immunity be conferred is understandable, but we must take another view. The question of immunity arose as Salas was contradicting his previous sworn testimonyan occurrence we presume was not subject to the State's prescience. Although the district court allowed Defendant wide latitude on cross-examination, it *1118 did not allow any cross-examination in the area of the understanding between the State and the witness. Even though the witness was not a "parolee or a suspect," State v. Baldizan, 99 N.M. 106, 108, 654 P.2d 559, 561 (Ct.App.1982), or a probationer or possible suspect, see Davis, 415 U.S. at 317-18, 94 S.Ct. 1105, who was making an explicit deal with the State for his testimony, he had perjured himself, either at his deposition or on the stand. The heart of the matter is not whether a deal was actually made, but whether the jury could infer bias or a motivation to fabricate in order to either strike a deal with the State or to curry a favor with the State by cooperation during the trial had the jury known the State had made a promise.
{25} The State's offer to immunize Salas against prosecution for perjury would likely have been enforceable against the State, and the very fact that during Salas's testimony it represented to the district court that it had no intention of pursuing any sworn falsehoods was certainly a matter worthy of inquiry by a defense team that was interested in demonstrating Salas's bias or motives to testify. For the district court to exclude such a topic from the reach of the defense's purview was error. Because of the nature of the witness and the importance of his testimony, we hold that the error was not harmless, and it compels a reversal of Defendant's convictions.
Tampering With Evidence
{26} Defendant contends there was insufficient evidence to support his conviction for tampering with evidence. We address this argument because Defendant would be entitled to dismissal, instead of retrial, if the evidence at trial were insufficient to support his conviction. State v. Jojola, 2005-NMCA-119, ¶ 2, 138 N.M. 459, 122 P.3d 43.
{27} The State's evidence consists only of Salas's testimony that Defendant had at one time held a gun during the incident. In determining whether there was sufficient evidence; we look to whether there was substantial evidence "of either a direct or circumstantial nature . . . to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." State v. Sutphin, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We also view evidence in the light most favorable to the guilty verdict, "indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." State v. Cunningham, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.
{28} In order for Defendant to be found guilty of tampering with evidence, the State must establish two things: (1) Defendant destroyed, changed, hid, placed, or fabricated physical evidence; and (2) "Defendant intended to prevent his apprehension, prosecution or conviction." State v. Johnson, 2004-NMSC-029, ¶ 52, 136 N.M. 348, 98 P.3d 998; NMSA 1978, § 30-22-5(A) (2003). "To support a conviction under a beyond a reasonable doubt standard, the evidence and inferences drawn from that evidence must be sufficiently compelling so that a hypothetical reasonable factfinder could have reached `a subjective state of near certitude of the guilt of the accused.'" State v. Wynn, 2001-NMCA-020, ¶ 5, 130 N.M. 381, 24 P.3d 816 (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
{29} The State's argument regarding Defendant's conviction for tampering with evidence is succinct: Decedent was killed with a gun, Defendant possessed a gun, which "was physical evidence of the murder," and the gun was never recovered. Therefore, the State argues, Defendant is guilty of tampering with evidence. We can find no evidence beyond the fact that Defendant may have held a gun. No evidence establishes that this gun was "physical evidence of the murder." At trial, the State neglected to point to Salas's testimony indicating that it looked as if "the other guys were reaching for a gun or something" at the time he ran from his apartment.
{30} The State argues that this issue is controlled by State v. Lopez, 2005-NMSC-036, 138 N.M. 521, 123 P.3d 754. We disagree. This case is not analogous to Lopez. In Lopez, the defendant admitted to throwing a gun into the woods. Admitting both his possession of the gun and the act of *1119 throwing it away led the Court to state that "[t]he jury could infer that [the defendant] committed these acts to avoid apprehension." Id. ¶ 22. In this case, there is no evidence as to what happened to the gun after the murder. The State's only evidence that Defendant possibly tampered with evidence is that the police could not find or recover a gun Defendant possessed.
{31} The State's argument fails twice. We hold that the fact that a person once held a weapon at a murder scene that was not recoveredthe extent of the evidence in this caseis no basis from which to infer that Defendant acted to destroy or hide physical evidence of a crime with the intent to "prevent the apprehension, prosecution or conviction of [himself]." UJI 14-2241 NMRA; see State v. Duran, 2006-NMSC-035, ¶ 13, 140 N.M. 94, 140 P.3d 515. It must also be proven that Defendant undertook some activity with the requisite intent. Duran, 2006-NMSC-035, ¶ 13; see State v. Roybal, 115 N.M. 27, 34, 846 P.2d 333, 340 (Ct.App.1992). What the State suggests we regard as the jury's "inference" that an act took place, our Supreme Court instructed us in Duran to regard as "speculation." Duran, 2006-NMSC-035, ¶ 15. Because speculation will not support a verdict, and because there is insufficient evidence to support the tampering conviction, we reverse Defendant's conviction for tampering and instruct the district court to dismiss the tampering charge on remand.
Defendant's Confrontation Clause Claims Concerning Joseph's Statements
{32} We address Defendant's Confrontation Clause claims as they may come up again on retrial. The State proceeded to trial on the theory that Defendant was guilty of murder, not as a principal, but as an accessory to Joseph, "help[ing Joseph] and encourag[ing] him" to kill Decedent. Castro testified at trial that, during the early morning of August 31, 2001, co-defendant Joseph came to her and told her that he had shot Decedent. When she was asked if she remembered Joseph telling her that Defendant was involved, she said that she did remember, but that she did not remember when he told her. At this point she broke down and the court took a recess. Upon the trial resuming, and having been shown a copy of her deposition, she stated that Joseph told her that Defendant "said to shoot him." The point of timing is unclear from Castro's testimony.
{33} The district court had previously entered Castro's deposition into evidence as "Court's Exhibit 4," during argument on Defendant's first motion to sever his case from Joseph's. The district court found that:
Castro testified to two admissions. One, she stated, the first one, upon Joseph Silva arriving home, that he made a statement to her which constituted an admission against Joseph Silva. It's unclear whether she inculpated [Defendant] or not at that time. . . . She indicated that Joseph indicated that he admitted to her or confessed to the crime to her but without seeing more.
The second part, apparently a telephone call between her and Joseph, Joseph went beyond that, stating that not only was he the person in effect that committed the murder, but [Defendant] told him to.
{34} As a result of the division of the statements, the State asserts that these are "[a]rguably . . . two different statements"  the first that Joseph shot Decedent, and the second statement inculpating Defendant that is more "inculpatory" against Joseph for the inclusion of Defendant. The district court found that the inclusion of Defendant within the statements "creates a factual interest for first degree murder, willful and deliberate, and the second degree crime of conspiracy, as opposed to lesser included, and it also implicates [Defendant], at least [if] not more of a degree than Joseph." The district court further found that the statement did not shift blame away from Joseph.
{35} Both statements were offered against Defendant to prove the truth of the matters asserted therein, namely that Joseph shot Decedent after being told by Defendant to do so. The statements are hearsay under Rule 11-801(C) NMRA, and inadmissible unless otherwise allowed by rule or statute. Rule 11-802 NMRA.
*1120 {36} Neither party disputes that Joseph, himself a co-defendant at trial, was unavailable to testify, see generally Rule 11-804 NMRA (hearsay exceptions requiring the unavailability of the declarant), and that Defendant had no prior opportunity to cross examine him. Defendant preserved his argument that admission of the statements violated his Sixth Amendment rights, both by moving to sever his trial from the other defendants, including Joseph, citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and by objecting to admission of the statements prior to Castro's testimony, and at the time Castro testified. Both motions were denied by the district court.
{37} In ruling on these questions, the district court held that the statement was admissible under Rule 11-804(B)(3) as a statement against penal interest. The district court recognized that the statement inculpated Defendant, stating that "the [c]ourt could implicate each [defendant] equally," but stated that the inclusion of Defendant as telling Joseph to shoot Decedent would actually increase the peril to Joseph's penal interest by "remov[ing] him from lesser degrees of the crime, such as consideration possibly for second degree or lesser included murder under the circumstances." The district court went on to state that the statement "did not tend to shift responsibility away from Joseph . . ., and it [was] corroborated by independent evidence" indicating that Defendant was present at the scene and involved in the incident. The district court concluded that the statement would be admissible at separate trials against both Defendant and Joseph, and denied the motion to sever.
{38} Under the Sixth Amendment to the United States Constitution, all criminal defendants are guaranteed the right to be confronted with and to cross examine witnesses against them. See Alvarez-Lopez, 2004-NMSC-030, ¶ 6. This is subject to some limitations. In New Mexico, the Confrontation Clause permits admission of a non-available declarant's hearsay statements that fall outside of Crawford if it either falls within a "firmly rooted hearsay exception" to the hearsay rule or if not, if it carries with it "particularized guarantees of trustworthiness" equivalent to those associated with a firmly rooted exception. Alvarez-Lopez, 2004-NMSC-030, ¶ 16 (internal quotation marks and citation omitted).
Crawford v. Washington
{39} In 2004, the Supreme Court of the United States in Crawford, held that the Sixth Amendment requires "unavailability and a prior opportunity for cross-examination" in order for a testimonial statement to be admitted at trial. 541 U.S. at 68, 124 S.Ct. 1354. The Court in Crawford stated that the Confrontation Clause applies in situations where the declarant is in the position of being a witness and giving statements that are "testimonial" in character. Id. at 51, 124 S.Ct. 1354. If the statement is testimonial, a judicial determination of its reliability under the rules of evidence is immaterial to its admissibility, see State v. Forbes, 2005-NMSC-027, ¶ 12, 138 N.M. 264, 119 P.3d 144, and the only relevant consideration is whether the statement was given a chance to be tested in "the crucible of cross-examination." Id. (internal quotation marks and citation omitted). On the other hand, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Davis v. Washington, ___ U.S. ___, ___, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006).
{40} Defendant urges us to regard Joseph's statement as testimonial. The State asserts that it is not testimonial, and that it is admissible under the exception to the hearsay rule contained in Rule 11-804(B)(3), or other guarantees of trustworthiness. Since the admission of hearsay can raise issues under the Confrontation Clause which are questions of law, we review this ruling, and Confrontation Clause questions in general, under a de novo standard. State v. Walters, 2006-NMCA-071, ¶ 23, 139 N.M. 705, 137 P.3d 645, cert. granted, 2006-NMCERT-006, 140 N.M. 226, 141 P.3d 1280; State v. Lopez, 2000-NMSC-003, ¶ 10, 128 *1121 N.M. 410, 993 P.2d 727. We agree with the State that the statement was not testimonial.
{41} Crawford provided a number of examples of what "testimonial" statements would be, including a broad definition suggested by the National Association of Criminal Defense Lawyers: "[S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 52, 124 S.Ct. 1354 (internal quotation marks and citation omitted). The Supreme Court's decision in Davis is not helpful here, as this case does not concern statements made to police. See generally Davis, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224. This case presents us with a statement far removed from one made in the course of an official investigation or made to a public official. The statement was not given in connection with any official contact with the declarant, and was not given in such circumstances that the declarant might anticipate its preservation for later use "to establish or prove past events potentially relevant to later criminal prosecution." State v. Wright, 726 N.W.2d 464, 472 (Minn.2007). We therefore do not view the statement as one given in a situation that would lead the declarant to have an objective belief that it would be available for use at a later trial, and hold that the statement is not testimonial. See Alvarez-Lopez, 2004-NMSC-030, ¶ 23.
{42} Crawford deals with testimonial statements given by persons who are not co-defendants, although testimonial statements given by co-defendants and used against other defendants at trial is a Crawford issue. Walters, 2006-NMCA-071, ¶ 49 (reversing convictions for presenting co-defendants' interlocking confessions in violation of Confrontation Clause). Walters noted a tendency toward "ever-increasing restrictions on the use of a co-defendant's out-of-court statements" in federal jurisprudence. Id. ¶ 36. Walters dealt with testimonial statements. Our Supreme Court in Alvarez-Lopez noted "that Crawford may not be applicable to statements made to friends or acquaintances that satisfy our Rule 11-804(B)(3) analysis." Alvarez-Lopez, 2004-NMSC-030, ¶ 23. In Alvarez-Lopez, a custodial confession by a co-defendant implicating the defendant was found to be testimonial and in violation of the Confrontation Clause, yet our Supreme Court indicated in dicta that a non-testimonial statement of that type might fall outside a Confrontation Clause analysis altogether. Id. ¶¶ 22, 23.
{43} In the absence of a testimonial statement, which we hold that this statement was not, we return to the "traditional" analysis of whether an absent co-defendant's inculpatory statement violates Defendant's Sixth Amendment rights under Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), abrogated on other grounds as recognized in Crawford, 541 U.S. at 60, 124 S.Ct. 1354. See also Alvarez-Lopez, 2004-NMSC-030, ¶¶ 16, 22 (holding that where non-testimonial hearsay is involved, we return to Roberts analysis). Where the declarant is unavailable, as in this case, we can admit the hearsay statement if it demonstrates sufficient "`indicia of reliability,'" meaning that (1) the evidence fell within a "firmly rooted hearsay exception" or (2) the statement possessed "particularized guarantees of trustworthiness." Roberts, 448 U.S. at 66, 100 S.Ct. 2531; Alvarez-Lopez, 2004-NMSC-030, ¶ 16.
Rules of Evidence
{44} First, it is clear that the declarant of the statement, Joseph, was unavailable to testify. Joseph did not testify at trial, which makes him unavailable as a witness because we assume he exercised his privilege against self-incrimination. See McGuinness v. State, 92 N.M. 441, 444, 589 P.2d 1032, 1035 (1979). The statements made by Joseph to Castro were statements against his penal interest. Rule 11-804(B)(3) provides that statements against interest are included as a hearsay exception when "(1) the declarant is unavailable as a witness and (2) the statement at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Alvarez-Lopez, 2004-NMSC-030, ¶ 17 (alterations in original) (internal quotation *1122 marks omitted). Joseph admitted shooting Decedent. Only one shot was involved, and one shot killed him; the statements are unequivocally self-inculpatory.
{45} Defendant points to Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), for the proposition that any statements against penal interest by absent co-defendants that are sought to be used to inculpate another are inherently suspect, and would not satisfy the first Roberts test of being a "firmly rooted exception" to the hearsay rule. Lilly, 527 U.S. at 124-25, 119 S.Ct. 1887. This argument was dismissed by our Supreme Court in Alvarez-Lopez, which pointed out that since Lilly, New Mexico has continued to regard statements against penal interest as being within a "`firmly rooted'" exception, saying "any evidence properly admitted under Rule 11-804(B)(3) would survive constitutional scrutiny." Alvarez-Lopez, 2004-NMSC-030, ¶ 19.
{46} Alvarez-Lopez overruled this line of cases insofar as they concern testimonial statements. See id. However, as noted above, the Court saw no need to address "the continued vitality of our Confrontation Clause opinions regarding statements against penal interest made to co-defendants, friends, family, or acquaintances." Id. ¶ 23. Although we recognize the logic of Lilly, and have occasionally dipped a toe in waters not precisely mapped by the Supreme Court, see State v. Parish, 118 N.M. 39, 47, 878 P.2d 988, 996 (1994); State v. Duarte, 2004-NMCA-117, ¶ 11, 136 N.M. 404, 98 P.3d 1054 ("[W]e are given more latitude when the precise issue has not been already decided by our Supreme Court."), we cannot overrule the precedent it establishes. Duarte, 2004-NMCA-117, ¶ 11. We have previously held that statements acknowledging criminal activity made to friends and acquaintances are more likely to be sufficiently trustworthy than statements made to authorities, which are more likely to be motivated by a desire to curry favor. See Gonzales, 1999-NMSC-033, ¶ 12 (upholding the admissibility of a statement in which the declarant said he committed the crime at the behest of another to be against penal interest); State v. Gutierrez, 119 N.M. 658, 661, 894 P.2d 1014, 1017 (Ct.App.1995) (recognizing that a statement made to a friend or acquaintance "is sufficiently against self-interest that a reasonable person is unlikely to make it unless it is true").
{47} This approach is not without its problems. We are dealing with two statements; the first unfettered by any reference to Defendant, and the second, made some time later by telephone, that implicates Defendant. It is necessary that "the precise matter offered for its truth ought to be against the interest of the declarant." State v. Self, 88 N.M. 37, 41, 536 P.2d 1093, 1097 (Ct.App.1975). Duarte gives us pause, because in that case, the portion of the accomplice's statement implicating the defendant was held to be outside the penal interest exception, irrespective of its testimonial nature. Duarte, 2004-NMCA-117, ¶ 21. We look to the whole of the surrounding circumstances in deciding whether the statement should be admissible. Id. ¶¶ 17-18.
{48} In Duarte, the declarant gave a statement to the police after being caught red-handed in a drug deal, and then gave a later statement implicating his father, the defendant. Id. ¶ 18. We held that the statement implicating the defendant was not a statement against penal interest because the declarant's liability was already unquestioned, and the later statement was likely given with a motive to either lessen his criminal liability or curry favor with the police who were interviewing him. Id. ¶ 20. It is conceivable that Joseph made his second statement implicating Defendant in the murder to show that somehow he was compelled to shoot Decedent, which is arguably congruent with Duarte. Duarte, however, has two distinguishing characteristics that we believe take us away from such an analysis. First, the declarant in Duarte had been caught red-handed with 500 pounds of marijuana; there was no question of his involvement, and his admission only "proved" a known fact. Id. ¶¶ 2, 7, 18. Second, this Court in Duarte pointed out that where the statement there was made to police in the course of trying to work a deal, the statement in Gonzales was made in a statement to an acquaintance, away from motivations inherent to official *1123 contact. Duarte, 2004-NMCA-117, ¶ 20. In Gonzales the declarant told an acquaintance that he had shot the victims and that the defendant had paid him for shooting one of the victims, 1999-NMSC033, ¶ 3, and our Supreme Court held that the statement provided a factual basis for charging the declarant with willful and deliberate murder and that "a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Id. ¶¶ 11-12 (internal quotation marks and citation omitted). In this context, we believe that Gonzales represents the better view, and hold that Joseph's statement was admissible.
Bruton v. United States
{49} When the statement of a co-defendant at trial implicates the defendant to the point that it presents a substantial threat to a defendant's right to a fair trial, defendant may be entitled to a severance. Bruton, 391 U.S. at 131-32, 88 S.Ct. 1620. Defendant requested a severance on at least two occasions during trial which were denied. Defendant has not briefed the issue of whether denial of these motions was error, and we consider the issue abandoned, and will not address it here. See State v. Rendleman, 2003-NMCA-150, 188, 134 N.M. 744, 82 P.3d 554 (noting that when a party has not briefed an issue, the issue is deemed abandoned on appeal).
CONCLUSION
{50} Because the State could not offer any evidence other than Salas's testimony that Defendant held a gun, we hold that there was not substantial evidence to support the tampering with evidence conviction and remand for dismissal of that charge. Last, because the issue is likely to arise on retrial, we hold that the statements of Joseph were non-testimonial, fall outside of Crawford as a result, and were properly admitted. We hold that the district court's ruling to limit cross-examination of Salas's testimony regarding a perjury deal made with the State was not harmless error, and we reverse and remand for a new trial.
{51} IT IS SO ORDERED.
WE CONCUR: MICHAEL D. BUSTAMANTE and CYNTHIA A. FRY, Judges.